## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:14-cv-656-RJC-DSC

DAVID BRASS, RICHARD )
HAMILTON, CHARLES KOZITZKY, )
RON BEEGLE, DAVID BABCOCK, )
and CARL VAN LOON, )
          )
       **Plaintiffs,** )
          )           <u>ORDER</u>
**v.** )
          )
SPX CORPORATION, )
          )
       **Defendant.** )
_____ )

       **THIS MATTER** comes before the Court on Defendant's Motion for Summary

Judgment, (Doc. No. 183); its Memorandum and Affidavit in Support, (Docs. Nos.

184–186), Plaintiffs' Response in Opposition, (Docs. Nos. 192–193); Defendant's

Reply, (Doc. No. 197); Plaintiffs' Motion for Partial Summary Judgment, (Doc. No.

187); their Memorandum in Support, (Doc. No. 188); Defendant's Response in

Opposition, (Doc. No. 190); Plaintiffs' Reply, (Doc. No. 202); Defendant's Motion in

Limine to Exclude Plaintiffs' Expert Report, (Doc. No. 199); Defendant's

Memorandum in Support, (Doc. No. 200); Defendant's Motion to Strike Plaintiffs'

Expert Report, (Doc. No. 201); Plaintiffs' Response in Opposition, (Doc. No. 205);

Defendant's Reply (Doc. No. 210); Plaintiffs' Motion to Strike Defendant's Expert

Report, (Doc. No. 206); Defendant's Response in Opposition, (Doc. No. 211); and

Plaintiffs' Reply (Doc. No. 213). These motions are ripe and ready for adjudication.[1]

---

[1] This order will be filed under seal due to its various references to the parties' sealed
memoranda and exhibits.

## I.  BACKGROUND

### A.  Procedural Background

David Brass, Ron Beegle, David Babcock, Carl Van Loon, Richard Hamilton, and Charles Kozitzky ("Plaintiffs" or "retirees"), along with several other retirees who have since been dismissed from this case, filed their Complaint against SPX Corporation ("Defendant" or "SPX") on November 25, 2014.  (Doc. No. 1).  Plaintiffs brought two claims in their Complaint: (1) violation of the settlement agreements under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; and (2) violation of employee welfare benefit plans under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).[2]  Plaintiffs filed their Motion for Preliminary Injunction on December 15, 2015 (Doc. No. 9).

By the time Plaintiffs' Motion for Preliminary Injunction became ripe, the event that Plaintiff sought to prevent had already occurred, and this Court denied the motion as moot.  (Doc. No. 31).  Plaintiffs appealed to the Fourth Circuit on October 27, 2015, (Doc. No. 34), whereupon the Fourth Circuit denied Plaintiffs' appeal on September 28, 2017, affirming this Court's Order under different reasoning and remanding for further proceedings.  (Doc. No. 80).  This Court denied Plaintiffs' Motion to Certify Class, filed during the intervening time period, on October 17, 2017. (Doc. No. 81).

---

[2] The amended complaint asserts an LMRA claim and an ERISA claim for each settlement agreement and thus asserts a total of four claims.

Following failed settlement discussions both parties now seek summary judgment. Defendant filed its Motion for Summary Judgment on October 9, 2020. (Doc. No. 183; <u>see also</u> Docs. Nos. 184–186, 192, 193, 197). Plaintiffs filed their Motion for Partial Summary Judgment on the same day. (Doc. No. 187; <u>see also</u> Docs. Nos. 188, 190, 202, 203). This Court heard oral arguments from both parties regarding their respective motions on November 18, 2020.

The parties have also filed recent motions to strike expert witness opinions. On October 30, 2020, Defendant filed a Motion in Limine and a Motion to Strike, both to exclude the reports, opinions, and testimony of Plaintiffs' expert Michael A. Dunn. (Docs. No. 199, 201; <u>see also</u> Docs. Nos. 200, 205, 210). On November 13, 2020, Plaintiffs filed a Motion to Strike as well, to exclude portions of Defendant's expert report and the corresponding testimony of Defendant's expert Adam Reese. (Doc. No. 206; <u>see also</u> Doc. No. 211).

B. <u>Factual Background</u>

1. Early-2000s Settlement Agreements between the Parties

In 2001, the UAW along with several retired SPX union members filed two class action lawsuits against SPX alleging it had violated the union members' rights to lifetime health benefits.[3] (Doc. No. 1, ¶2: Complaint). The parties eventually negotiated a resolution to those suits, which led to the execution and court approval of two settlement agreements in 2004 (the "Settlement Agreements").[4] (<u>Id</u>.). The

---

[3] See <u>Di Biase et al. v. SPX Corp. et al.</u>, No. 1:01-cv-624-RAE (W.D. Mich.); <u>Pedler et al. v. SPX Corp.</u>, No. 1:01-cv-623-RAE (W.D. Mich.).

[4] Amended Final Judgment and Order of Dismissal, <u>Di Biase et al.</u>, No. 1:01-cv-624-RAE (W.D. Mich. January 29, 2004), ECF No. 85; Amended Final Judgment and

language at issue in each Settlement Agreement is identical. (Id.). In the Settlement Agreements, SPX agreed to provide certain health care benefits to retirees and surviving spouses for the remainder of their lives. (Id. ¶ 26). Some specific benefits differed depending on the residence of the retirees, (Doc. No. 10 at 5-6), and exhibits to the Settlement Agreements set out the principal features of the described plans, including, among other things, co-pays, out-of-pocket expenses, deductibles, payment limits, and coverage. See (Doc. Nos. 1-1 at 47-77; 1-2 at 50-62).

    2. Benefits Structure Required by the Settlement Agreements

The Settlement Agreements do not mandate that SPX provide a particular plan or type of plan, nor do they require that SPX provide benefits that are identical to those described in the accompanying exhibits. The Agreements instead memorialized the benefit levels upon which the parties had agreed. The Settlement Agreements provided that SPX could change plans, carriers, networks, and providers so long as SPX provided benefits that were "substantially equivalent" to those agreed upon in the Agreements. (Complaint, ¶27). The relevant language in both Agreements, to which both parties cite, reads:

> Notwithstanding any other provision hereof, any obligation on the part of SPX to provide coverage under a specified plan or its substantial equivalent shall be deemed to require only that SPX provide coverage which is substantially equivalent in benefits and it shall not be deemed to obligate SPX to provide such coverage through an HMO, to maintain or replicate coverage in a particular network, to provide benefits through a structure under which the patient designates a primary care physician or otherwise to regulate or affect the manner in which SPX makes such substantially equivalent benefits available.

---

Order of Dismissal, Pedler et al., No. 1:01-cv-623-RAE (W.D. Mich. January 30, 2004), ECF No. 90.

4

Except to the extent that SPX is obligated by this Agreement to provide coverage under a specified plan or its substantial equivalent, SPX retains its right to, at any time, and from time to time: (a) amend or modify the provisions of any plan; (b) change the plan administrator, carrier, trustee or any other person or entity rendering services to or with respect to any plan; (c) merge the plan with any other plan or split up or spin off any portion of any plan; (d) unilaterally make any change to any plan required by applicable law or maintain the tax status of any plan or the benefit provided under any plan; or (e) any combination of these items.

(Doc. No. 1-1, ¶¶5.6, 5.7; Doc. No. 1-2, ¶¶5.6, 5.7).

The exhibits to the Settlement Agreements set out features of the described benefit levels, including co-pays, out-of-pocket expenses, deductibles, payment limits, coverage, and so forth. (Doc. No. 16, Affidavit of Leisa White, at ¶ 13; Settlement Agreements at 9–14). Specifically, the Settlement Agreements require:

- Medical coverage under specific medical plans or their "substantial equivalent." (Doc. No. 1-1, ¶ 5.1(a), (b); Doc. No. 1-2, ¶ 5.1(a), (b)).

- A Prescription Drug Plan with no annual maximums on coverage and with set co-pays for each subscription covering all Federal legend drugs, or the "substantial equivalent" of such a prescription plan. (Id.).

- SPX prescription drug plan that covers all Federal legend drugs prescribed by a physician, except for those specifically excluded, and covering both formulary and non-formulary drugs. (Doc. No. 1-1, ¶ 5.1(a), (b), Ex. G; (b); Doc. No. 1-2, ¶ 5.1(a), (b), Ex. I).

- Partial monthly reimbursement of Medicare Part B premiums. (Doc. No. 1-1, ¶ 5.5; Doc. No. 1-2, ¶ 5.3).

- Michigan law covers the terms and conditions of the Settlement Agreement. (Id. ¶ 9.12).

- The benefits required by the Agreements will be covered for life, or for as long as the Settlement Class Members remain members. (Id. ¶ 5.1).

- Settlement Class Members under the Muskegon Agreement had to make a one-time, permanent election whether to remain in the Beneflix program or whether to become Traditional Plan Participants. (Doc. No. 1-2, ¶ 5.1(a)(1)).

5

- SPX must provide a customer service contact number for each plan of insurance, to help retirees with unresolved questions about plan benefits and status of claims, as well as the ability for a Settlement Class Member Representative to contact a SPX employee to address any unresolved questions. (Docs. Nos. 1-1, 1-2, ¶ 5.10).

3. In 2014 SPX Announced a New Benefits Structure

After the signing of the Settlement Agreements in 2004, SPX made several changes affecting the provision of benefits to the settlement groups without complaint from the UAW. (Doc. No. 10 at 11-12).

Then in early 2014, SPX decided to change the structure through which it provided medical benefits to the settlement members. (Doc. No. 15 at 11–14). It hired Willis Towers Watson ("WTW"), a consulting firm that provides actuarial and benefit design consulting services, to assist with designing the new program. (Doc. No. 16, ¶ 25). SPX informed WTW of its obligation to provide the retirees with benefits substantially equivalent to their then-existing benefit. (Doc. No. 16, ¶ 35; Tomic Dep., 91:10–20, 102:11–103:6). WTW compared the costs of Medicare Part F plans, which SPX considers the most comprehensive Medigap plans available, and that SPX argues provides richer benefits than group plans in the Settlement Agreements. (Doc. No 184 at 10). WTW used calculations based on SPX's retiree consensus data and its own medical and prescription drug claim continuance tables and determined that a robust plan would cost an average of $3,400 a year, to which SPX added catastrophic drug coverage and increased the base annual amount to $5,000. (Doc. No. 17, ¶¶ 14–17).

6

On March 18, 2014, SPX sent letters to the UAW and its counsel notifying them that SPX was proposing to change the structure through which it provided medical benefits to the settlement members beginning January 1, 2015. (Doc. No. 16, ¶41). On July 1, 2014, SPX sent a notice to each affected member describing the changes and providing information that the changes would take effect January 1, 2015. (Id. ¶42). On August 11, 2014, OneExchange sent each retiree a startup packet, and on August 12, 2014, SPX sent another letter to the members describing the health benefits changes. (Id. ¶¶44–45). On September 19, 2014, SPX received a Notice of Dispute from Plaintiffs' counsel. (Id. ¶47). Open enrollment in the individual Medicare market began on October 1, 2014. (Id. ¶49).

### 4. SPX Corporation's HRA Plan

Effective January 2015, SPX implemented a Healthcare Reimbursement Account Plan ("HRA") in place of the prior plan. (Doc. No. 81, Order at 1). Under this plan Medicare-eligible class members were to enroll in HRA accounts that had been set up for them, and the members were to acquire their own insurance and be reimbursed for the purchase using the HRA funds. (Id.).

HRAs are tax-free accounts used to reimburse individuals for eligible health care expenses, including premium payments on insurance plans and a set of out-of-pocket expenses such as copays and coinsurance. (Doc. No. 1-3). The terms of the HRA plan are set out in its Summary Plan Description and Plan Document ("SPD"). (Doc. No. 1–5, SPD). The HRA serves as "a bookkeeping account on SPX's records" through which SPX pledges to reimburse a class member for certain expenses. (Id.

at 6). Each individual then uses his or her HRA to buy his or her own insurance policy in the individual Medicare market.

SPX also engaged OneExchange (now known as 'Via Benefits,' a private healthcare marketplace that helps individuals find and purchase individual health plans) to assist the members in their transition from the group plan to individual coverage. (Doc. No. 15 at 13). Furthermore, the SPX HRA plan was to reimburse the members for their current amount of Medicare Part B reimbursement, to provide catastrophic drug coverage through a separate HRA, and to give each member previously enrolled in a dental plan an additional $500 per year. (Doc. No. 16 ¶36: Affidavit of Leisa White). The money in each HRA rolls over each year and can be used to pay all medical expenses, except certain pharmacy and prescription drug expenses. (Id.; Doc. No. 1-5).

5. Plaintiffs File this Action

Plaintiffs filed their Complaint in this matter on November 25, 2014, (Doc. No. 1), and then filed their Motion for Preliminary Injunction on December 15, 2014 (Doc. No. 9). Plaintiffs brought two claims in their Complaint: (1) violation of the Settlement Agreements under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; and (2) violation of employee welfare benefit plans under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).[5]

_____

[5] The amended complaint asserts an LMRA claim and an ERISA claim for each Settlement Agreement and thus asserts a total of four claims.

8

Given that Plaintiffs' Preliminary Injunction Motion was filed on December 15, 2014, the Motion did not become ripe for review until after SPX filed its Response on January 5, 2015 and Plaintiffs filed their Reply on January 15, 2015. (Docs. Nos. 15, 19). SPX's changeover from the group plan to the HRAs took effect on January 1, 2015, before the Preliminary Injunction Motion became ripe, so the motion was denied as moot. Defendants appealed to the Fourth Circuit.

6. Fourth Circuit Decision in This Case

On review the Fourth Circuit determined that the Plaintiff's Preliminary Injunction Motion was not moot, but found nonetheless that Plaintiffs had failed to show a sufficient likelihood of success on the merits. <u>Di Biase v. SPX Corp.</u>, 872 F.3d 224 (4th Cir. 2017). Specifically, the Fourth Circuit found the following:

> SPX's obligation under the settlement agreements requires only that SPX provide coverage which is "substantially equivalent in benefits." Given the broader parameters within which SPX may make healthcare benefits available, a more in-depth factual analysis, based on a more fully-developed record, is needed to determine whether HRAs in general, based upon their structure, as well as the specific terms of the HRAs SPX established for its retirees, provide substantially equivalent healthcare benefits in accordance with terms of the settlement agreements.

> While case law from our sister circuits may be deemed persuasive when deciding these issues on the merits, we agree with SPX's assertion that at a minimum, the pertinent provisions of the settlement agreements are ambiguous on the question of whether an HRA is a "plan" that provides "coverage" as contemplated by the parties. Such ambiguity is simply insufficient to support a finding that success on the merits is "likely" rather than merely "possible" and is fatal to Plaintiffs' motion for preliminary injunction. Thus we must conclude that the district court did not abuse its discretion in finding that Plaintiffs failed to demonstrate a likelihood of success on the merits.

<u>Di Base</u>, 872 F.3d at 234–235.

Upon the return of this case, this Court denied Plaintiffs' motion to certify class (Doc. No. 81) and then granted several motions by the parties to extend time and adjust the schedule. (Docs. Nos. 85, 87, 92, 97, 103). The parties have since presented evidence on the record to support their contentions, which this Court has reviewed in evaluating the parties' respective motions for summary judgment.

7. Evidence Presented by the Parties after Discovery

In the interests of judicial economy, the Court will summarize the parties' most relevant factual record evidence here, which the parties themselves have pointed to in their motions for summary judgment. Read in the light most favorable to the Plaintiffs, the following facts have been introduced into the record:

- The UAW had at least once previously used the phrase "substantially equivalent" to describe benefits that differed in form but resulted in no diminution of benefits to employees or retirees. (Jeffrey Beegle Dep. II, 1-6-20, at 20–21).

- SPX sent two letters in February 1997 to Muskegon plant employees informing them SPX would ensure their contractually negotiated pension benefits would remain "substantially similar" in all material aspects following the sale. (Exhibits 2, 3 from Leisa White Dep. II).

- In September 2002 the parties exchanged letters in which Plaintiffs insisted on substantially equivalent benefits, and would not agree to reduced benefits. (Exs. 5, 174 from Beegle Dep. 1-6-20).

- The parties jointly represented to court after a settlement hearing in Michigan in August 2002 that "SPX will provide healthcare coverage as follows…and that coverage will be the Keystone 65 medical HMO with the appropriate dental, eye care, and vision riders. With regard to this plan…this plan and all the other plans we'll be talking about, there's an understanding that the plan will be maintained in substantially equivalent form." (Exs. 6, 176 from Beegle Dep. 1-6-20, Transcript of Settlement Hearing at 4).

- The Joint Notice to class members in 2003 stated that members would receive health insurance benefits for life, and will receive a certain type of traditional plan coverage depending on the individual member's Medicare eligibility. (Ex. 7 from Leisa White Dep II).

10

- Enrollment packages that SPX sent to retirees included materials that described SPX as providing medical coverage. (Ex. 8 from Leisa White Dep. II).

- Former SPX counsel testified that they did not remember discussing the meaning of 'substantially equivalent,' (Brent Kidwell Dep.; William Scoglund Dep. At 24, 28, 41), but that Plaintiffs' lawyer sent a letter to Defendants at the time rejecting a plan with non-equivalent benefits, and testified that the parties did not negotiate for a right to change the benefits. (Michael Fayette Dep at 44, 47, 49, 50, 123, 130, 151). Plaintiffs' lawyer also said there were no discussions of HRAs, and testified that Plaintiffs would not have agreed to a settlement agreement that would have permitted SPX to install an HRA. (Id. at 162).

- SPX chose an HRA model that potentially could allow 10% of the Settlement Class to become worse off financially than under the original Settlement Agreements plans. (Aleksander Tomic Dep. at 189; White Dep. I at 71, 151, 161, 162).

- There is no prescription drug plan available to class settlement members that would identically match the drug coverage retirees had under the initial coverage under the Settlement Agreements. (Id. at 103, 128, 130).

- The HRA exposes retirees to a prescription drug coverage gap, or 'donut hole.' (Id. at 99, 103).

- Inflation could financially harm the retirees under the HRA unless SPX later changes the program. (Tomic Dep. at 105).

- Plaintiffs' expert report opined that the HRA presents administrative challenges for retirees, the HRA contribution is frozen and will not increase (placing inflation risk on retirees), and the prescription drug benefits under the HRA are inferior to those under the previous plan, including containing a 'donut hole.' (Doc. No. 188 Ex. 13 at 1–7).

- Defendant's expert report compared the prior and current plans, and opined that the six Plaintiffs have each been better off under the HRA structure than they would have been under the group plans. (Doc. No. 185-1 at 4).

- SPX informed WTW in designing the HRA program that SPX has an obligation to provide the retirees with benefits substantially equivalent to their then-existing benefits. (Doc. No. 184-4).

- WTW determined that a Medicare Plan F plus a preferred plan D (combining the richest plans available) would cost an average of $3,400 a year for Plaintiffs, so Defendant then increased this amount by

11

$1,600 to provide cushion in order to arrive at the $5,000 HRA number. (Docs. Nos. 16, 17).

- SPX hired Via Benefits (formerly "One Exchange") to help Plaintiffs select their own plans on the individual marketplace. ViaBenefits advisors are licensed and participate in mandatory six-week training programs to help provide coverage, and do not receive commissions. Their average length of a call is nearly 70 minutes. (Doc. No. 18).

- Plaintiff Beegle testified that he has filed for reimbursements and had several reimbursements denied without explanation. (Doc. No. 193-11). He also testified that he did not receive owed reimbursements due to having missed filing deadlines, including not receiving the Medicare Part B reimbursement. (Doc. No. 193-11 at 22, 24–25, 30, 34, 39–40, 44, 53, 57–60, 78, 87–88, 90–92).

- Plaintiff Van Loon testified that he has declined to request Medicare Part B reimbursements because he believes that there would not be sufficient HRA funds in his account to cover these reimbursements. (Doc. No. 193-12).

- Plaintiff Kozitzky testified that he had numerous reimbursements denied despite his belief that he submitted the reimbursement requests properly. (Doc. No. 193-13).

- Plaintiff Babcock testified that he missed several thousand dollars of reimbursements due to having missed SPX's reimbursement deadlines. (Doc. No. 193-10 at 90–100).

- Plaintiff Hamilton testified that he became so frustrated with the reimbursement forms and process that he gave up and began paying everything on his own without reimbursement. (Doc. No. 193-14 at 12, 67, 69, 71, 74, 76–77).

## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if

12

it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which a reasonable finder of fact could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248. If the evidence is merely colorable, or

13

is not significantly probative, summary judgment is appropriate. <u>Id.</u> at 249–50. Furthermore, "[i]n assessing a summary judgment motion, a court is entitled to consider only the evidence that would be admissible at trial." <u>Kennedy v. Joy Techs., Inc.</u>, 269 F. App'x 302, 308 (4th Cir. 2008).

"ERISA actions are usually adjudicated on summary judgment rather than trial." <u>Vincent v. Lucent Technologies, Inc.</u>, 733 F. Supp. 2d 729, 733–34 (W.D.N.C. 2010) (Mullen, J.) (citing <u>Carden v. Aetna Life Ins. Co.</u>, 559 F.3d 256, 260 (4th Cir. 2009) (<u>Niemeyer</u>, Michael, Smith, JJ.).

B. <u>Discussion</u>

Plaintiff's Amended Complaint contains four claims: two claims of 'violation of the Settlement Agreements' under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and two claims of 'violation of ERISA plans' under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). (Doc. No. 49 at 9–12). Defendant seeks to dismiss all four claims at summary judgment, while Plaintiffs seek partial summary judgment in their favor on their claims that the HRA does not provide substantially equivalent healthcare coverage to that guaranteed under the Settlement Agreements due to several specific differences. (Docs. Nos. 183, 188 at 25).

The Settlement Agreements state that "any obligation on the part of SPX to provide coverage under a specified plan or its substantial equivalent shall be deemed to require only that SPX provide coverage which is substantially equivalent in benefits and it shall not be deemed . . . to regulate or affect the manner in which SPX makes such substantially equivalent benefits available." (Doc. No. 1-1, ¶5.6, 5.7; Doc.

14

No. 1-2, ¶5.6, 5.7).  The Fourth Circuit has examined this phrase and explained that Plaintiffs' claims "turn[] on whether the creation of the HRA accounts satisfies the 'substantially equivalent' provisions of each of the settlement agreements."  Di Biase v. SPX Corp., 872 F.3d at 234.  Both parties' motions for summary judgment hinge on whether SPX's HRA system provides "substantially equivalent" benefits to those described in the Settlement Agreements.  The Court will address the contractual definition of "substantially equivalent" and apply that definition to SPX's HRA system.

### 1.  The Meaning of "Substantially Equivalent" Benefits

The Court must first determine the meaning of the phrase "substantially equivalent" as it is used in the Settlement Agreements.  Both agreements contain Michigan choice of law provisions. (Doc. No. 1-1, ¶ 9.12; Doc. No. 1-2, ¶ 9.12). "[W]here the contracting parties have agreed 'that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect.'" Synovus Bank v. Coleman, 887 F. Supp. 2d 659, 668 (W.D.N.C. 2012) (quoting Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980)).

Under Michigan law, "construction of a contract, whether it is ambiguous or unambiguous, is a question of law for the court. . . .  The function of the court is to determine and give effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole." Aetna Cas. & Sur. Co. v. Dow Chem. Co., 28 F. Supp. 2d 440, 444 (E.D. Mich. 1998) (internal citations omitted).  "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter

15

of law." In re Smith Trust, 480 Mich. 19, 24, 745 N.W.2d 754 (2008). "If the contract is ambiguous, the court must determine the intent of the parties." Cincinnati Ins. Co. v. Fed. Ins. Co., 166 F. Supp. 2d 1172, 1177 (E.D. Mich. 2001).

The Settlement Agreements do not define the term "substantially equivalent benefits," and the parties do not cite, nor could this Court find, any Michigan case law defining the term. Additionally, although Plaintiffs argue that there is extrinsic evidence regarding the meaning of the phrase, (see, e.g., Doc. No. 192 at 2), the Court has examined the evidence and does not find it persuasive.[6]

Examining the parties' use of the phrase in context, the term "substantially equivalent" is employed in different variations throughout both Settlement Agreements, and refers to coverage, a coverage plan, or benefits. (See, e.g., Doc. No. 1-1 ¶ 5(a)(2)(ii) ("SPX shall provide coverage under the SPX Retiree Medical Plan – PPO, or its substantial equivalent . . . ."); ¶ 5(b) ("The remaining provisions of the prescription drug program shall remain substantially equivalent to the SPX Prescription Plan . . . ."); ¶ 5.6 (". . . any obligation on the part of SPX to provide coverage under a specified plan or its substantial equivalent shall be deemed to only

---

[6] None of the lawyers present for the settlement negotiations could definitively recall discussion of the phrase's meaning during the negotiations themselves. It is true that when the parties reached a settlement in principle and before they wrote the 2004 Settlement Agreements at issue here, they described to a federal court their "understanding that the plan will be maintained in substantially equivalent form." (Exs. 5, 174 from Beegle Dep. 1-6-20). However, the phrase "substantially equivalent form" never ended up in the Settlement Agreements, which instead affirmatively provided SPX with flexibility as to form. Plaintiffs' appeals to SPX's later descriptions of the initial coverage under the Settlement Agreements are equally unavailing, as there is no dispute over what the initial coverage entailed, and such descriptions do not suggest that other forms of coverage were contractually barred.

16

require that SPX provide coverage which is substantially equivalent in benefits . . . .") ¶ 5.8(a) (". . . shall pay a premium co-pay equal to 50% (fifty percent) of the cost of benefits provided under the Hartford Senior Medical Insurance Plan, or its substantial equivalent . . . "). While the phrase "substantially equivalent" is used to refer to different objects, the meaning of the phrase itself appears to be consistent throughout.

Merriam Webster's Dictionary provides several definitions of both words in this phrase, but one definition of each fits most naturally with each one of the phrase's uses throughout the agreements: "Substantial: . . . (5) being largely but not wholly that which is specified," and "Equivalent: . . . (3) corresponding or virtually identical especially in effect or function." (*Substantial* and *Equivalent*, <u>Merriam Webster's Collegiate Dictionary</u> (10th ed. 1993)). The Court notes that the parties did not leave the term equivalent unadorned. Instead, they chose a modifier, "substantially." They chose the word "substantially" rather than "substantively," the latter of which would have required equivalence in the substance of the benefits, while the former instead requires "largely but not wholly" equivalent benefits.

Upon reviewing the Agreements, then, the phrase "substantially equivalent" has a fixed and unambiguous meaning. This Court therefore "must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." <u>In re Smith Trust</u>, 480 Mich. at 24. Given the lack of Michigan case law defining the specific term, and in the absence of sufficient extrinsic evidence to hold otherwise, the Settlement Agreements' use of the phrase "substantially equivalent" benefits provides no reason to assign the phrase anything

17

other than its plain meaning. This Court will therefore apply the definition of the phrase that the context of its use requires: that 'substantially equivalent' benefits are benefits that are 'largely but not wholly identical especially in effect or function' to the benefits specified in the agreements.

### 2. Plaintiffs' Claim that HRAs Inherently Violate the Settlements

Before the Court can apply this definition to the current specific HRA plans, it must address an issue raised by Plaintiffs at the outset: whether any HRA system inherently violates the Settlement Agreements. Plaintiffs argue that HRAs are not a "plan" that provides "coverage," that that therefore they are categorical violations of SPX's obligations under the agreements. Plaintiffs present Sixth Circuit case law and extrinsic evidence about the settlements to bolster this proposition. However, the Sixth Circuit cases are inapposite, and the extrinsic evidence does not supersede a plain reading of the Settlement Agreements' terms.

As the Fourth Circuit has already explained, "[o]f the cases Plaintiffs cite, only United Steelworkers of America, AFL–CIO v. Kelsey–Hayes Co., 750 F.3d 546 (6th Cir. 2014), involves the replacement of retirees health insurance plans with HRAs." Di Biase v. SPX Corp., 872 F.3d 224, 234 (4th Cir. 2017).[7] In Kelsey-Hayes the Sixth

_____

[7] Plaintiffs also cite Bontrager v. Indiana Family & Soc. Servs. Admin., 829 F. Supp. 2d 688 (N.D. Ind. 2011) aff'd, 697 F.3d 604 (7th Cir. 2012). The legal dispute in Bontrager centered on what it meant that Medicaid was to "cover" specific medically-necessary treatments. Bontrager, 829 F. Supp. 2d at 690. In that nonbinding case, the Seventh Circuit affirmed the district court's ruling that a $1,000 cap on such services was insufficient to provide 'coverage' for Medicaid purposes. Bontrager, 697 F.3d at 610. However, the facts in Bontrager concerned a spending cap on a particular procedure rather than payment for a separate insurance plan, and the case involved neither an HRA nor the broad contractual language contained here.

Circuit, while discussing a benefits agreement that entitled retirees to a continuation of the same coverages they had as employees, found that "HRAs are not company-provided insurance; they are health care vouchers – essentially cash," and that HRAs did not meet the company's obligation to continue "healthcare coverages" to plaintiffs in that case. Kelsey-Hays, 350 F.3d at 554–555. But the terms of the agreement the Sixth Circuit considered in Kelsey-Hays "differ significantly from the provisions of the settlement agreement in this case." Di Biase, 872 F.3d at 234.

In Kelsey-Hayes, the agreement in question required that if any healthcare benefits provided by Kelsey-Hayes became impracticable or unpermitted, the Company was to provide "new benefits and/or *coverages as closely related as possible* and of equivalent value to those not provided." Kelsey-Hayes, 750 F.3d at 549 (emphasis added). By contrast, the Settlement Agreements in our case only require SPX to provide coverage that is "substantially equivalent in benefits," and this requirement explicitly "shall not be deemed . . . to regulate or affect the manner in which SPX makes such substantially equivalent benefits available." (Doc. No. 1-1 ¶5.6). Unlike in Kelsey-Hayes, the Settlement Agreements here do not require 'coverage as closely related as possible' to the original plan, and do not require SPX to use any particular type of method to make substantially equivalent benefits available to the Plaintiffs. The Sixth Circuit's finding in Kelsey-Hayes that HRAs did not qualify as "company-provided group insurance" has no bearing on this case, as the agreements here do not require SPX to provide insurance itself. Instead, under the bargained-for agreements to which these parties consented, SPX is obligated only to provide coverage that is 'substantially equivalent in benefits.'.

19

With Sixth Circuit case law being inapposite, and extrinsic evidence being unpersuasive,[8] an application of the Settlement Agreements' plain language shows that HRAs in general do not facially violate SPX's obligations. The question instead is whether this particular HRA system violates the Settlement Agreement. To answer that question, this Court must examine whether the HRA structure that SPX has put in place provides "substantially equivalent benefits" to these Plaintiffs.

3. Whether SPX's HRA System Offers "Substantially Equivalent Benefits"

Plaintiffs have provided several arguments that this particular HRA system fails to provide substantially equivalent benefits as required under the Settlement Agreements. (See Docs. Nos. 188, 192, 202, 212). This Court will analyze each argument in turn.

a. HRAs as "Plans" that "Provide Coverage"

Plaintiff argues that even aside from Sixth Circuit precedent, SPX's HRA system is not a "plan" that provides "coverage" and that it therefore violates the Settlement Agreements. (See, e.g., Doc. No. 188 at 19–22). In support of this argument, Plaintiffs offer the definitional case that an HRA is a funding mechanism rather than something that provides coverage, along with several pieces of extrinsic evidence regarding the parties' understanding about the coverage forms required. (Id.; see also Doc. No. 212).

Though a reading of the Settlement Agreements does not reveal an obligation that SPX provide a "plan" to all retirees, the agreements do require SPX to "provide coverage" to the Plaintiffs. (See e.g., Doc. No. 1-2 ¶ 5.1(b)). The Settlement

---

[8] See Footnote 6.

20

Case 3:14-cv-00656-RJC-DSC   Document 221   Filed 02/04/21   Page 20 of 39

Agreements do not define the term "provide coverage," but the use of the phrase in context makes its meaning clear as used. Given that the agreements "shall be deemed to require only that SPX provide coverage which is substantially equivalent in benefits" and cannot "regulate or affect the manner in which SPX makes such substantially equivalent benefits available," the contract would be internally contradictory if the phrase "provide coverage" in fact regulated the manner in which SPX were allowed to make such benefits available. (Docs. Nos. 1-1, 1-2 at ¶ 5.6). A plain reading of the agreements reveals only one definition of each such word that applies to its usage in context: "provide: *vt* 2. to supply *or make available*" and "coverage: 1. something that covers, as (a) inclusion within the scope of an insurance policy or protection plan . . . ." (*Provide* and *Coverage*, <u>Merriam Webster's Collegiate Dictionary</u> (10th ed. 1993) (emphasis added)).

The phrase "provide coverage" in context means "supply or make available inclusion within the scope of an insurance policy or protection plan," a meaning that eliminates any potential internal contradictions. SPX thereby could fulfill its obligation to "provide coverage" by making such coverage available rather than by supplying it, and here they have attempted to make such coverage available by creating HRAs as funding mechanisms to pay for the coverage. This method of providing coverage does not inherently violate the agreements – the question instead is whether the specific HRA method chosen by SPX provides "substantially equivalent benefits" to those required by the agreements.

Plaintiffs' reliance on extrinsic evidence fails to affect the interpretation of "provide coverage" for the same reason. The Court would look to such extrinsic

evidence if the meaning of the phrase in question were "ambiguous," <u>Cincinnati Ins.</u> <u>Co.</u>, 166 F. Supp. at 1177, but because no such ambiguity exists here, the Court instead "must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." <u>In re Smith Trust</u>, 480 Mich. at 24.

### b. Reservation of Rights

Plaintiffs next argue that SPX's HRA system violates the Settlement Agreements because, under the new system, SPX reserves the right to change or terminate the HRA plan. Specifically, the Summary Plan Description ("SPD") for SPX's HRA system says: "SPX has the right to modify or terminate the Plan at any time for any reason," and later continues "SPX . . . reserves the right to terminate the Plan at any time. . . . In general, if the Plan is terminated you will not be vested in any benefits . . . ." (Doc. No. 1-5 at 12, 18). Plaintiffs again cite <u>Kelsey-Hayes</u>, 750 F.3d 546, the concurrence of which states that "a reservation of rights to end all coverage is the antithesis of a *lifetime* commitment," <u>Kelsey-Hayes Co.</u>, 750 F.3d at 561 (Sutton, J., concurring) (emphasis in original), to support their argument that SPX's reservation of rights under the HRA system violates the settlement agreements.

As already noted, <u>Kelsey-Hayes</u> is distinguishable from this case. Once again this distinction matters: unlike in <u>Kelsey-Hays</u>, the agreements in this case provide that "[e]xcept to the extent that SPX is obligated by this Agreement to provide coverage under a specified plan or its substantial equivalent, SPX retains its right to, at any time . . . amend or modify the provisions of any plan . . . ." (Docs. Nos. 1-1, 1-

22

2, ¶ 5.7).  In other words, unless otherwise required to provide a specific plan or its substantial equivalent, the Settlement Agreements allow SPX to determine and change the plan particulars "at any time."  If SPX were to terminate the HRA system and implement a different system instead, SPX would ultimately be modifying plan provisions in the coverage that it offers to retirees – a modification that the contract allows SPX to make "at any time" so long as the coverage itself is contractually sufficient.  SPX's reservation of rights in its HRA SPD is not a violation of the Settlement Agreements; instead, it is a natural corollary to the settlements' provisions.

### c.  Capped Contributions

Plaintiffs argue that SPX violated the Settlement Agreements by setting annual $5,000 limits on the amount of credit provided for each retiree's HRA account. (Doc. No. 212 at 18).  Plaintiffs say that the Settlement Agreements require SPX to pay for the specified plans at no cost to the retirees, with a few specific exceptions, and that prescription drug prices were explicitly set out as having no annual caps on the amount SPX would pay.  (Doc. No. 188 at 17; Doc. No. 192 at 4).  By placing limitations on the reimbursement for these costs, Plaintiff argues, SPX violated the requirements in the Settlement Agreements that SPX pay for these two areas of coverage in full.   SPX argues in response that it has not actually capped its contributions, as it remains open to increasing the annual amounts if the market changes, and that the evidence shows SPX is paying the sufficient amount to fulfill its obligation to provide "substantially equivalent benefits."  (Docs. Nos. 190, 212).

23

The agreements themselves guarantee that the "benefits provided for in Section 5.1 shall be provided to the Settlement Class Member at no cost to the Settlement Class Member" except for a chart of relevant co-payments that the class member is required to pay for the services. (Docs. Nos. 1-1, 1-2, ¶ 5.3). The agreements also say that "SPX shall provide prescription drug coverage under the SPX Prescription Plan, or its substantial equivalent . . . . There shall be no annual maximums placed on such prescription drug coverage." (Doc No. 1-1 at ¶ 5.1(b)(1), Doc. No. 1-2 at ¶ 5.1(b)). The Court will separately evaluate Plaintiffs' claim that the benefits themselves provided are not contractually sufficient; here, Plaintiffs claim that SPX's very spending caps violate the settlement agreements, and the Court will evaluate that claim on its own.

SPX has not inherently violated the Settlement Agreements by setting an annual $5,000 HRA reimbursement level. At the outset, Plaintiffs have not introduced sufficient evidence beyond speculation that any of the Plaintiffs has been required to empty out their HRA account yet or will be required to do so, and looking forward, SPX's Director of Benefits has submitted an uncontradicted affidavit with SPX's commitment to making any changes to the program (including increased funding levels) if marketplace changes occur requiring such changes in order to provide substantially equivalent benefits. (Doc. No. 191-1). Plaintiffs have not introduced sufficient evidence that Plaintiffs either have or will run into a spending cap preventing them from receiving substantially equivalent benefits.

Regardless, to address Plaintiffs' facial challenge to the HRA annual funding amount, SPX covers the retiree's costs in paying for health insurance, including

24

prescription drug coverage, by providing HRA funds to each retiree. The two spending obligations that Plaintiffs cite here are (1) to cover the cost of the required benefits or their substantial equivalent, and (2) to cover the costs of the required prescription drug coverage or its substantial equivalent. SPX can fulfill both obligations by providing enough funding in the HRA account for the Plaintiffs to purchase the coverage that is 'substantially equivalent' to those promised by the Settlement Agreements. So long as the retirees are not forced to pay additional funds in order to receive this substantially equivalent benefits and drug coverage, SPX has acted in accordance with the Settlement Agreements. The pertinent question is whether the HRA can be used to provide substantially equivalent coverage in the first place.

### d. Prescription Drug Coverage

Plaintiffs argue that the prescription drug coverage offered under the HRA system is a violation of the Settlement Agreements. Specifically, Plaintiff argues that the HRA program does not offer substantially equivalent prescription drug benefits, citing as examples (a) that the HRA program exposes retirees to a prescription drug coverage gap (the "donut hole"),[9] (b) that the drugs now cost more for retirees than the Settlement Agreements allow, and (c) that the Settlement Agreements require coverage of all Federal legend drugs, yet the HRA system only makes varying

---

[9] The 'donut hole' is a gap in coverage under Medicare prescription drug plans such that, once the retiree has spent a certain amount of money that year on covered drugs, the plan ceases to cover remaining drug costs for the rest of the year – requiring the retiree to pay out-of-pocket – until the retiree then hits a certain higher spending number, at which point the coverage begins again. (Doc. No. 188 at 4–5; Doc. 212).

formularies available to retirees instead. (Doc. No. 188 at 24–25; see also Doc. No. 212). Plaintiffs cite retirees who have been unable to obtain particular drugs under the HRA system despite the prior plan having covered the same drugs. (Doc. No. 202 at 16). To bolster their argument, Plaintiffs quote the WTW representative himself as agreeing that the currently-available prescription coverage does not match that which the Settlement Agreements provided. (Doc. No. 188 at 13). Defendant argues in reply that Plaintiffs are holistically financially better off under the HRA program, that Plaintiffs have not offered evidence to show that Plaintiffs have actually reached the "donut hole," and that the Medicare program requires the availability of at least two drugs for most therapeutic levels such that other equivalent drug choices are available to the retirees. (Doc. No. 190 at 19–21; Doc. No. 197 at 22).

As noted above, the Settlement Agreements guarantee that the "benefits provided for in Section 5.1 shall be provided to the Settlement Class Member at no cost to the Settlement Class Member" other than the relevant copayments, (Docs. Nos. 1-1, 1-2 at ¶ 5.3), and that "SPX shall provide prescription drug coverage under the SPX Prescription Plan, or its substantial equivalent . . . ." (Doc No. 1-1 at ¶ 5.1(b)(1), Doc. No. 1-2 at ¶ 5.1(b)). Applying the previously-discussed definitions to this provision, the Settlement Agreements require SPX to provide the retirees with coverage that is 'largely but not wholly identical [to the SPX Prescription Plan] especially in effect or function.' Furthermore, the SPX Prescription Drug Plan allowed retirees to purchase drugs (subject to a few exceptions) at rates varying from $20 to $90 per purchase, with the $90 rate reserved for drugs that were not on SPX's Preferred Prescription Formulary list. (Doc. No. 1-1 at 65–68).

26

Here Plaintiffs first argue that the existence of the 'donut hole' is a violation of the Settlement Agreements. Evaluating the facts in the light most favorable to the Plaintiffs, under SPX's HRA program, these out-of-pocket costs are not reimbursable. (Doc. No. 203–1 at 26). Despite allowing out-of-pocket copay expenses, the original drug plan under the Settlement Agreements contained no such gap in coverage as the 'donut hole' potentially provides. (Doc. No 1-1 at 68).

The Settlement Agreements require that SPX provide the benefits under Section 5.1, which includes the SPX Prescription Drug Plan (or its substantial equivalent), at "no cost" to the retirees. This language is facially at odds with the rest of the Settlement Agreements, which elsewhere allow SPX to require retirees to pay prescription drug copays among other potential coverage expenses. (See, e.g., Doc. No. 1-1 ¶ 5.1; Id. at 68). The meaning of "no cost" in this context is that SPX must provide the benefits in question (or their substantial equivalent) at no cost above what the agreements elsewhere allow.

Evaluating whether the HRA system indeed does so requires a holistic look at whether SPX's alterations have increased the cost of the benefits to retirees. The determination of that issue would not hinge upon a coverage gap in one area so long as the net result were for the retiree to receive substantially equivalent benefits at no increased net costs. Therefore, the donut hole's existence does not automatically violate the Settlement Agreements, as the relevant question is whether the HRA system has required the retirees to undergo net increased costs for substantially equivalent benefits – a question that the Court will evaluate in the next section below.

27

The second prescription drug argument that Plaintiffs raise is that the Settlement Agreements require SPX to provide coverage for all prescription drugs (formulary and non-formulary), as existed under the original SPX Prescription Drug Plan. Plaintiffs have introduced evidence that specific drugs previously covered under the SPX Prescription Drug Plan are not covered under the HRA program. (See, e.g., Doc. 193-6 at 20 – 22). Yet the issue under the Settlement Agreements is not whether these identical drugs are covered under the new system, but rather whether substantially equivalent drug coverage is provided – coverage that could include comparable substitutes for the drugs in question. Plaintiffs must therefore show that the coverage options available under the HRA fail to cover the needed drugs as well as all such comparable substitutes.

They have not done so. Instead, Plaintiffs cite testimony that a particular plan chosen by one Plaintiff does not cover the specific drug that used to be covered, and also cite expert witness statements opining that a theoretical retiree could select a plan that does not cover a drug the retiree might require, and also that there are no open-formulary plans available on the HRA-covered marketplace. (Doc. No. 202 at 4; Doc. No. 202-1 at 191–192). Yet this Plaintiff testimony and expert conjecture, even if relied upon, would not provide a basis for the argument Plaintiff needs to make: that there are no options for the individual Plaintiffs to find substantially-equivalent coverage for their own required drugs (or comparable substitutes) on the marketplace in question. Plaintiffs have not supported such a position with sufficient evidence for a reasonable finder of fact to return a verdict on their behalf on this issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

e. Net Costs to Retirees

The agreements require SPX to provide substantially equivalent benefits at the same cost to retirees. The remaining Plaintiff-alleged violations of this requirement not yet addressed by the Court fall into two categories: cost-related, and administrative-burden-related. The Court will first address the cost-related requirements of the Settlement Agreements.

Plaintiffs argue that the HRA system results in higher costs to the retirees than the Settlement Agreements allow, citing numerous specific costs that retirees must pay under the HRA system that they did not pay under the prior plan.[10] Furthermore, Plaintiffs argue that Defendant's HRA calculations were designed to allow 10-15% of the retirees to be financially worse-off under the HRA system. (Doc. No. 188 at 13, 24). Finally, Plaintiffs argue that the HRA system shifts the risk of increased cost to the retirees. (Doc. No. 188 at 4–5). Defendant argues in reply that as a result of WTW's detailed actuarial assumptions and models used to design the HRA system, each retiree is financially better off and receives substantially equivalent coverage under the HRA system. (Doc. No 184 at 15).

The Settlement Agreements require that SPX provide substantially equivalent benefits at "no cost" to the retirees. (Doc. No. 1-1, 1-2, ¶ 5.1). As previously discussed, the meaning of "no cost" in this context is that SPX must

---

[10] These additional costs, several of which this Court has previously addressed, include: an inability to cover prescription drug costs under the HRA, the donut hole, non-covered drugs requiring payments well in excess of the original $90 per prescription, losses incurred due to failed or non-attempted reimbursements, applications for reimbursement of Medicare Part B instead of automatic reimbursements, and commission for usage of the WTW customer service system. (See, e.g., Doc. No. 188 at 4–5).

29

provide these substantially equivalent benefits in question at no cost above what the agreements elsewhere allow, requiring a holistic look at whether SPX's alterations have increased the cost of these benefits to retirees.

Plaintiffs argue that the individual Plaintiffs have in fact been financially harmed under the HRA system by having to pay more overall costs than they did previously. As evidence, Plaintiffs cite heavily to facts described in a series of appendixes to an expert report by their expert Michael A. Dunn. (Doc. No. 192 at 8–9, citing Doc. No. 193-6 at 12–23). Yet the factual allegations described in these appendixes are not themselves cited within the expert's report, and cannot be considered independent fact evidence unless they exist elsewhere in the factual record. Island Intellectual Prop. LLC v. Deutsche Bank AG, 2012 WL 526722 at *2 (S.D.N.Y. Feb. 14, 2012) (An expert "may not . . . directly transmit facts to the jury, about which he has no personal knowledge . . . . The proposed expert may refer to documents he has reviewed and—to the extent that they have already been admitted into evidence—show particularly relevant passages to the jury, but must stop short of simply summarizing their contents in narrative form. That would inappropriately transform an expert, without firsthand knowledge, into a quasi-fact witness"). While an expert witness may rely upon inadmissible evidence in forming his opinion, a court assessing a summary judgment motion "is entitled to consider only the evidence that would be admissible at trial." Kennedy v. Joy Techs., Inc., 269 F. App'x 302, 308 (4th Cir. 2008). Plaintiffs do not provide additional citations to the otherwise-inadmissible facts in question. This Court also notes that Plaintiffs' expert witness identifies several issues and concerns with the HRA

program, but does not undertake to holistically compare the overall costs incurred by Plaintiffs under the old and new systems. (Doc. No. 193-6). The remaining evidence that Plaintiffs cite for the purposes of this cost-related argument is the specific deposition testimony of each Plaintiff. (Doc. No. 192 at 9).

The individual Plaintiffs testified to two different types of increased costs: administrative costs (such as reimbursement deadlines) and non-administrative costs (such as reimbursement denials for substantive reasons). As to these latter substantive non-administrative costs, three Plaintiffs addressed such costs in their depositions: Plaintiff Beegle testified that he has filed for reimbursement and had the reimbursements denied without explanation, (Doc. No. 193-11), Plaintiff Van Loon has declined to request Medicare Part B reimbursements because he believes that there would not be sufficient HRA funds in his account to cover these reimbursements, (Doc. No. 193-12), and Plaintiff Kozitzky testified that he had numerous reimbursements denied despite his belief that he submitted the reimbursement requests properly. (Doc. No. 193-13). Defendant in reply cites expert witness Adam J. Reese's analysis and conclusion that all six Plaintiffs are financially better off under the HRA system while receiving substantially equivalent benefits. (Doc. No. 197 at 17, citing Doc. No. 185-1 at 4).

Here, Plaintiffs must show that the HRA system requires them to pay more than the prior system. They have presented evidence of particular costs that the HRA system requires them to pay – but they have not provided sufficient evidence comparing these costs holistically to costs under the prior plan to suggest that the overall required non-administrative expenses are higher for Plaintiffs under the

31

HRA system. Defendant has introduced fact evidence that the HRA system was designed to optimize overall spending on equivalent benefits for each Plaintiff, which might include increased costs in some areas offset by decreased costs in others. To avoid summary judgment on this issue, Plaintiffs must introduce sufficient evidence for a reasonable finder of fact to be able to find that at least one Plaintiff was holistically required to be financially worse off under the HRA, rather than worse off in particular areas. Despite having provided evidence of the latter, Plaintiffs have failed to provide sufficient evidence of the former here.

### f. Administrative Complaints

Plaintiff's remaining arguments against the HRA system can be categorized as complaints about the administration of the system's benefits, payments, and reimbursements. Plaintiffs argue that SPX implemented unnecessary deadlines to submit reimbursements that prevent Plaintiffs from receiving money they are owed, that the work of submitting reimbursement requests and selecting coverage is burdensome for the Plaintiffs, that the staff helping the retirees select their coverage sometimes suggest plans that result in higher costs, that Medicare Part B reimbursements are no longer automatic and require applications, and that these burdens are particularly difficult for the Plaintiffs who are generally older and often have memory-loss problems. (See Docs. Nos. 192, 212). Defendant replies that the evidence on the record does not support Plaintiffs' position, that SPX has fulfilled its contractual responsibility to provide substantially equivalent benefits whether or not Plaintiffs avail themselves of these benefits, and that it is still SPX rather than

32

the retirees who bear the administrative burden in fielding and funding reimbursement requests and plan selection. (Doc. No 190 at 3; Doc. No. 212).

<blockquote>

i. Burden Placed on Plaintiffs to Choose Coverage Options and Seek Reimbursements

</blockquote>

Plaintiffs first argue that, regardless of any costs, SPX violates the Settlement Agreements by placing the administrative burden on the retirees rather than on SPX. Under the HRA program the Plaintiffs are required to research and select their own coverage plans, and then pay expenses before having to apply for reimbursements for any covered costs (including applying for Medicare Part B reimbursements), and these reimbursement requests must be submitted within a certain period of time or else the retiree foregoes the reimbursement, none of which burdens were required under the prior system. Plaintiffs argue that these burdens are particularly difficult for retirees who are older and encountering memory problems. Furthermore, Plaintiffs suggest that the HRA plan shifts the risk from SPX to the retirees, such that if there are changes in the marketplace due to either plan availability or inflation, the retirees rather than SPX will now be financially hit. (Doc. No. 192 at 3). In reply Defendants argue that they have provided Plaintiffs with significant support for these administrative tasks, that retirees can easily submit reimbursement requests, that Defendant has committed to making any necessary changes in the event of marketplace changes, and that the Settlement Agreements do not prevent SPX from choosing the method of coverage so long as substantially equivalent benefits are available for coverage. (Doc. No 184 at 12; Doc. No. 192 at 6–8; Doc. No. 212).

33

The Settlement Agreements provide SPX with a wide berth within which to choose the method of coverage. (Doc. No. 1-1 ¶ 5.6). The agreements do not address administrative burdens or risk-bearing, and explicitly do not regulate the manner in which SPX makes the benefits in question available. Though Plaintiffs do not specify, given the broad language granting Defendant the ability to choose the form of coverage, the Court assumes that the Plaintiffs' challenge here is that Plaintiffs' administrative burdens under the HRA violate the Settlement Agreements' implied covenant of good faith and fair dealing, as other such iterations of Plaintiffs' challenge would fail. <u>Ada Liss Grp. v. Sara Lee Corp.</u>, 2010 WL 3910433 at *14 (M.D.N.C. Apr. 27, 2010) (citing the North Carolina Supreme Court for the proposition that all contracts contain such an implied covenant, and that a breach of the implied covenant claim is part and parcel of a breach of contract claim).

Yet Plaintiffs fail to show bad faith on the part of SPX here. Whatever the difficulties of the HRA system might be, SPX has hired a company to assist the retirees in selecting whatever available plan is best suited to their needs (which averages 70 minute initial phone calls to describe the options), has made reimbursement requests available through multiple methods, and provides the retirees up to a year to seek expense reimbursement. (Doc. No. 1-5 at 8–10; Borodkin Dep.. 41:7–42:1). It is true that Plaintiffs allege that the retirees are older and have difficulty remembering, and that SPX has the ability to alleviate their administrative burdens even further than it currently does under this system. However, there is no evidence in the record sufficient to suggest that SPX is attempting to take advantage of the retirees by implementing this system in place of the older one, or is otherwise

34

operating in bad faith. While the administrative burden placed on retirees could breach the implied covenant if more egregiously designed, the burdens in this case do not facially breach either the Settlement Agreements themselves or their implied covenants of good faith and fair dealing.

    ii.  Financial Costs to Plaintiffs due to Administrative Burden

Even if the administrative burdens placed on retirees under the HRA system do not facially breach the Settlement Agreements, the remaining question is whether the administrative burdens in fact force the retirees to pay more, thereby violating the contractual requirement that SPX provide substantially equivalent coverage at no cost to the retirees.

Plaintiffs argue that in practice, several administrative hurdles have forced them to pay increased costs. Plaintiff Babcock testified that he missed several thousand dollars of reimbursements due to having missed SPX's reimbursement deadlines. (Doc. No. 193-10 at 90–100). Plaintiff Beegle similarly testified to having not received reimbursements due to missed deadlines, including the Medicare Part B reimbursement. (Doc. No. 193-11 at 22, 24–25, 30, 34, 39–40, 44, 53, 57–60, 78, 87–88, 90–92). Plaintiffs argue that Plaintiff Brass has had reimbursements denied for administrative reasons such as missed deadlines, and the plan that Via Benefits recommended for him exposed him to high out-of-pocket costs for his health care, but Plaintiff cites only their expert's report for this proposition rather than fact evidence on the record. (Doc. No. 192 at 9). Plaintiff Hamilton testified that he became so frustrated with the reimbursement forms and process that he gave up and began paying for medical expenses on his own without seeking reimbursement. (Doc. No.

35

193-14 at 12, 67, 69, 71, 74, 76–77). Plaintiffs argue that these administrative challenges have led to increased costs in practice for the retirees whether or not the reimbursement system would otherwise work in theory. (Doc. No. 212). Defendant replies that the Plaintiffs' claims are not supported by the evidence on the record, and that Defendant's burden is to provide Plaintiffs with the ability to receive substantially equivalent coverage at no cost rather than to guarantee that Plaintiffs select that option. (Id.).

The Settlement Agreements require Defendant to "provide coverage which is substantially equivalent in benefits" and to "provide[]" this coverage at "no cost" to the retirees beyond what the contract otherwise allows. (Doc. No. 1-1, 1-2 at ¶ 5.3, 5.6). The agreements do not require SPX to ensure that Plaintiffs avail themselves of these benefits once provided. The bulk of Plaintiffs' complaints about administrative costs in practice describe expenses that Plaintiffs underwent because they did not comply with the reasonable reimbursement deadlines and requirements that were within Defendant's wide contractual purview to set. (Doc. No. 1-1 at 5.6). These costs are not attributable to the Defendant. The remaining administrative costs, such as costs associated with choosing a sub-optimal plan of the available options, similarly do not violate the agreements because they occurred as a result of Plaintiff's own decisions, even if the decision occurred after being advised by a third-party contractor hired by Defendant. Such decisions were still Plaintiffs' to make, and importantly, Plaintiffs have not provided evidence that no other sufficient options were available to them under this system. In these cases Plaintiffs still have not provided sufficient evidence to create a triable issue of fact on the argument that SPX

36

failed to provide them with suitable coverage under the Settlement Agreements, because they have not demonstrated that SPX did not make such coverage available to them.

## III.  MOTIONS TO EXCLUDE AND STRIKE EXPERT REPORTS AND TESTIMONY

The parties in this case have filed a series of motions to strike and exclude each other's expert witness reports and expert testimony.  (Docs. Nos. 199–201, 205–206, 210–211, 213).  Defendant argues that Plaintiffs' expert witness does not opine on the only relevant question in this case, and that his opinion does not reach the requirements of Rule 702.  (Doc. No. 200 at 2).  Plaintiffs argue that Defendant's expert witness failed to disclose a document that served as a basis of his opinion, and that the relevant portions of his expert testimony and opinion should be struck as a result.  (Doc. No. 213 at 1).

Contrary to the respective motions of the parties, however, the Court need not reach the admissibility of the respective expert reports here.  The factual record provides a sufficient basis on which to adjudicate the dispute without reliance upon the opinion testimony of either expert witness.  When a court does not rely on the opinion of an expert witness in reaching summary judgment, the motion to exclude that expert's opinion is rendered moot.  Colony Tire Corp. v. Fed. Ins. Co., 2017 WL 377940 at *1 (E.D.N.C. Jan. 26, 2017) ("Where the court did not rely on the opinion of [the expert witness] in rendering summary judgment in favor of plaintiff, defendant's motion to exclude [the] expert opinion is denied as moot").

## IV.  CONCLUSION

The determinative question in this case is whether SPX has provided the retirees with substantially equivalent benefits to those guaranteed in the original Settlement Agreements. (<u>Di Base</u>, 872 F.3d at 234–235; Doc. No. 1-1 ¶ 5.6). For the reasons stated above, there is "no genuine dispute as to any material fact" on that issue; Plaintiffs have failed to show that the SPX HRA system does not provide retirees with the contractually-required substantially equivalent benefits under the Settlement Agreements, and Defendant SPX "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Furthermore, because the Court did not rely on any expert witness report or opinion in determining summary judgment, the parties' cross motions to exclude and strike expert witness testimony are moot.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 183), is **GRANTED**;

2. Plaintiffs' Motion for Partial Summary Judgment, (Doc. No. 187), is **DENIED**;

3. Plaintiffs' Amended Complaint, (Doc. No. 49), is **DISMISSED WITH PREJUDICE**;

4. Defendant's Motions in Limine to Exclude and Motion to Strike the Reports, Opinions, and Testimony of Plaintiffs' Expert Michael A. Dunn, (Docs. Nos. 199, 201), are **DENIED AS MOOT**; and

5. Plaintiffs' Motion to Strike Response in Opposition to Motion and Exclude Defendant's Expert Witness Report and Testimony of Adam Reese, (Doc. No. 206), is **DENIED AS MOOT**.

38

**SO ORDERED.**

Signed: February 3, 2021

Robert J. Conrad, Jr.
United States District Judge